Steven J. PARKER, Karlene Toy Kaegel,
Kevin Kaegel, and Blue Markee,
Inc., Plaintiffs–Appellants,

v.

PULITZER PUBLISHING COMPANY,
Defendant–Respondent.

No. 64130.

Missouri Court of Appeals,
Eastern District,
Division Three.

June 28, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 4, 1994.

Application to Transfer Denied
Sept. 20, 1994.

Jay A. Summerville, Thomas B. Weaver, Armstrong, Teasdale, Schlafly & Davis, St. Louis, for plaintiffs-appellants.

Thomas C. Walsh, J. Thomas Archer, Bryan Cave, St. Louis, for defendant-respondent.

PUDLOWSKI, Judge.

This case comes to us on a grant of Pulitzer Publishing Company's (Pulitzer) motion to dismiss Steven J. Parker, Karlene Toy Kaegel, Kevin Kaegel and Blue Markee, Inc.'s (appellants) petition for failure to state a cause of action. It concerns the interpretation of identical contracts which existed be-

tween Pulitzer and appellants, the distributors of Pulitzer's St. Louis Post–Dispatch and Total Market Coverage Product (titled "You" at the time the parties entered into the contracts; currently titled "MetroPost.") The trial court dismissed the case finding, whether or not Pulitzer breached the contracts, distributors had expressly waived their right to bring a cause of action against Pulitzer for breach of contract. We reverse and remand.

In the contracts Pulitzer promised to give the carriers "exclusive" distributorship routes and to pay them a set fee for each newspaper they delivered. The fee varied based on the day, the number of pages, the number of advertiser's inserts, and whether the recipient was a subscriber or was only receiving a free copy of Pulitzer's Total Market Coverage Product. Distributors purchased the right to service the routes for fees varying from $20,000 to $200,000 dependant upon the route.[1]

In the event that Pulitzer terminates a distributor or forces him/her to assign a route, the contracts give the distributor the right to elect for arbitration to determine whether Pulitzer wrongfully terminated him/her. In the event the arbitrator finds Pulitzer terminated the distributor due to fraudulent conduct, the distributor is not entitled to any compensation. If Pulitzer terminated distributor due to unsatisfactory work, he/she is entitled to the fair market value of the route as determined by the parties or, in the event the parties do not agree, by the arbitrator. If the arbitrator finds Pulitzer wrongfully terminated a distributor, the arbitrator has the power to award distributor the fair market value of the lost route and twenty percent of the route's value in damages. Damages are to be increased to fifty percent of the fair market value of the route if the distributor is able to show he/she was terminated primarily as punishment for his/her activities within an association representing Pulitzer's carriers. Under the express terms of the contract, the arbitrator does not have the power to reinstate a distributor even if

---

1. It is not clear from the record whether appellants paid Pulitzer for the right to service the routes or whether they purchased the right from former distributors and entered into exclusive distributorship agreements with Pulitzer as a condition of the purchase.

Pulitzer terminated the distributor in bad faith. Absent forced assignment or termination, the contract is expressly interminable.

After entering into these exclusive distributorship agreements, varying only in the preambles of which there were two versions, the assigned routes and the payment per paper delivered, Pulitzer attempted to take actions which appellants believed constituted a breach of the agreement. First, Pulitzer formed the Gateway Consumer Services Company to deliver the MetroPost within appellants' exclusive delivery areas for less money than Pulitzer was required to pay appellants under the exclusive distributorship agreements and, second, Pulitzer attempted to initiate PostLink, a computer database system by which customers could retrieve sections of the Post Dispatch via a modem. Four of Pulitzer's distributors, appellants, filed a suit against Pulitzer claiming Pulitzer's actions constituted breaches of Pulitzer's agreement to *"recognize the exclusive home delivery rights* of the Carrier as set forth in [the map delineating the distributor's route] . . . and *not [to] terminate such territorial rights or aid, abet or assist in the creation of other **home delivery systems or carriers*** within all or any part of the territory set forth in [the map delineating the distributor's route] except in accordance with the provisions of Paragraph 9" which deals with terminations [emphasis added]. In their petition, appellants asked the court to certify the case as a proper class action on behalf of themselves and the approximately 220 other distributors under Rule 52.-08(b)1(A) and Rule 52.08(b)(2). Appellants also asked the court to find Pulitzer's offering of PostLink and reallocation of delivery service for MetroPost, without honoring the notice and the compensation requirements of the arbitration provision of the contracts, constitutes a breach of contract and to permanently enjoin Pulitzer from providing PostLink and reallocating delivery services for MetroPost within the exclusive delivery areas of the putative class members unless Pulitzer agrees to abide by the arbitration and buyout provisions. Appellants prayed for money damages for Pulitzer's alleged breach of contract to date and asked the court to enter judgment for such other relief as it deems proper.

In response to the distributors' petition, Pulitzer filed a motion to dismiss for failure to state a claim upon which relief may be granted. In its motion Pulitzer claimed that it did not consider either its actions with regard to MetroPost or PostLink to constitute a breach of its agreement with distributors since the agreement only covered the delivery of the actual St. Louis Post–Dispatch newspapers to paying subscribers. Pulitzer claimed, even if the court believed that Pulitzer breached the agreements, distributors had waived any right to enforce the contract absent termination or forced assignment, situations which were not alleged by distributors.

On March 5, 1993, the trial court stayed class action discovery until the date of its decision on Pulitzer's motion to dismiss unless mooted by such order. On May 10, 1993, the court granted the motion to dismiss as to the distributors' claims for a declaration of breach of contract, injunctive relief and money damages on the ground the distributors had waived any right to enforce the exclusivity provision under the contract, but overruled Pulitzer's motion to dismiss with regard to distributor's claim seeking specific performance of the contractual arbitration provisions. Since the court based its decision on the waiver clause, it did not address the other issues which were before it, namely, whether Pulitzer's actions with regard to the MetroPost or PostLink constituted breaches of the exclusive distributorship contract in that they were alternative delivery systems. The court also made no mention of the petition's request that the putative class be certified. After the trial court overruled Pulitzer's motion to dismiss appellants' claim for compelled arbitration, appellants requested the trial court dismiss any claim asking for arbitration the court may have read into their petition. The trial court granted this motion.

The named distributors then appealed the trial court's dismissal of the portion of their petition requesting an injunction and damages. Appellants claim the waiver provision

does not prevent them from bringing this action because it only prohibits a distributor from attempting to be reinstated following a termination or forced assignment and does not constitute a waiver of all rights to enforce the contract provisions. They note in this case all the parties agree the contract still exists and they are merely trying to obtain a remedy for Pulitzer's partial breach of contract. Appellants argue the arbitration clauses in the contracts are only invoked when Pulitzer terminates a distributor or forces him/her to assign his/her route, neither of which occurred in the case at hand. Accordingly, appellants contend the case should be treated as a regular breach of contract case and remanded to the trial court rather than to the arbitration table.

■ Fearing he would be bound by the actions taken by the named distributors in the trial court and on appeal, Daniel Knierim, an unnamed distributor, then motioned for permission to file an amicus curiae brief protesting appellants' failure to certify the class or to send notice to the putative members of the class. He alleged, due to the size, geographic and socioeconomic differences between the routes, the interests of the distributors in interpreting the contracts vary and, therefore, the other distributors should not be bound by any actions taken by appellants. In response, Pulitzer claimed the arguments presented by the named and unnamed distributors were identical and, therefore, the unnamed distributor was adequately represented by the appellants. The trial court refused to allow the unnamed distributor to submit an amicus curiae brief but permitted him to enter the case as an intervenor.

Appellants plead the case as a class action. Supreme Court Rule 52.08(c)(1) states: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Rule 52.08(a) notes some of the prerequisites to a class action are that "the claims or defenses of the representative parties are typical of the claims or defenses of the class" and "the representative parties will fairly and adequately protect the interests of the class." Since the class was never certified, the court's order cannot

bind distributors who were not named parties. *See, State ex rel. Niess v. Junkins,* 572 S.W.2d 468, 470 (Mo. banc 1978); *Moore v. City of Pacific,* 534 S.W.2d 486, 493 (Mo.App. St.L.D.1976). "To hold otherwise would bind numerous persons to a judgment without determining if they in fact constitute a proper class or whether the name representatives fairly and adequately represent their interests." *Moore,* 534 S.W.2d at 493. Had the trial court determined whether it should certify the class and appoint appellants as class representatives, it is questionable whether it would have answered in the affirmative. Although intervenor's position is similar to the original position held by appellants, it is diametrically opposed to the position later taken by appellants in the trial court. Intervenor contends the situation regarding MetroPost and PostLink falls within the arbitration provision of the contract. Appellants, in contrast, abandoned their claim for compelled arbitration *after* it had survived Pulitzer's motion to dismiss and *prior* to intervenor's request to submit an amicus curiae brief. Moreover, the amount of income derived by distributors from MetroPost distribution varies greatly from carrier to carrier. Some routes have low saturation of St. Louis Post–Dispatch home delivery circulation in which case delivery of the MetroPost plays an important role. Other routes have relatively high saturation of Post–Dispatch home delivery services in which case MetroPost distribution is financially insignificant to the carriers, a fact which may decrease those distributors' incentive to fight for their right to deliver the MetroPost and render them less likely to "fairly and adequately protect the interests of the class." Similarly, the potential impact of PostLink on distributors' profits differs greatly from route to route depending on the relative affluence of the community because one must own a computer to subscribe to PostLink. Finally, because the value of the routes varies greatly, some carriers may desire to resort to the trial court for damage assessment whereas distributors with smaller routes, who cannot afford expensive litigation, may prefer to go to arbitration and interpret the contract accordingly.

Pulitzer's argument that intervenor is bound because of his status fails because intervenor merely entered the case, to ensure he was not bound by appellants' actions, in the only way the trial court permitted him to be heard. Given that the trial court erred in forcing Daniel Knierim to be heard as an intervenor rather than allowing him to submit an amicus curiae brief, intervenor is not bound by this action.

■■■ Intervenor argues the case is not final for purposes of appeal because appellants plead their case as a class action and the court never ruled on whether the class should be certified. Although we have ruled intervenor is not a proper party to this action, we address this issue as we must respond to all doubts concerning our jurisdiction over a case. Although the court never certified the class nor ruled against appellants' request for certification, our courts have allowed named plaintiffs to personally proceed with their cases despite their failure to successfully join the putative class. *See, Concerned Parents v. Caruthersville Sch. Dist.,* 548 S.W.2d 554, 557 (Mo. banc 1977); *State ex rel. Niess,* 572 S.W.2d at 470; *Moore,* 534 S.W.2d at 493 (citations omitted). Intervenor also alleges the case is not final for purposes of appeal because the trial court overruled Pulitzer's motion to dismiss with regard to appellant's original prayer for the court to compel arbitration. However, appellants' voluntary dismissal of their claim for compelled arbitration, after the court's order overruling Pulitzer's motion to dismiss with respect to that claim, retroactively renders the order final for purposes of appeal. At the time the case was appealed all issues were resolved as to all named parties at the trial level leaving nothing for future determination. *Magee v. Blue Ridge Professional Bldg.,* 821 S.W.2d 839, 842 (Mo. banc 1991) (citations omitted).

■ We now respond to the primary issue on appeal, namely, whether the trial court erred in dismissing appellants' petition on the ground the waiver clause of the contracts precluded appellants from pursuing a claim against Pulitzer in court for breach of the exclusive distributorship provision in the contracts. In reviewing a trial court's dismissal of appellants' petition for failure to state a claim upon which relief can be granted, the sole issue we must determine is whether, after allowing the appellants' pleading its broadest possible intendment, treating all facts alleged as true and construing all allegations favorably to the appellants, the averments invoke principles of substantive law which would entitle the appellants to relief. *Lowrey v. Horvath,* 689 S.W.2d 625, 626 (Mo. banc 1985).

■■■ The rules of contract interpretation dictate that a contract must be construed as a whole. *Brackett v. Easton Boot and Shoe Co.,* 388 S.W.2d 842, 848 (Mo.1965) (citation omitted). "It must be viewed from end to end and corner to corner...." *State Mut. Life Assur. Co. of Worcester, Mass. v. Dischinger,* 263 S.W.2d 394, 401 (Mo.1953) (citations omitted). The intent of the parties is presumed to be expressed by the natural and ordinary meaning of the language in the contract. If, however, the language is unclear, the trier of fact may look past the corners of the contract to ascertain the intent of the parties. *Village of Cairo v. Bodine Contracting Co.,* 685 S.W.2d 253, 264 (Mo. App.W.D.1985). In so doing the trier of fact should interpret the contract in the light most favorable to the party who did not draft the contract. *Linnenbrink v. First Nat. Bank,* 839 S.W.2d 618, 622 (Mo.App.W.D. 1992) (citations omitted). Pulitzer argues the contract should not be interpreted in the light most favorable to distributors since the record is devoid of evidence of the identity of the drafter; however, Pulitzer entered into almost identical contracts with over two hundred distributors. Accordingly, we may reasonably assume that Pulitzer drafted the agreement and construe it favorably to the distributors.

■■■ The determination of whether a contract is ambiguous is a question of law for the court. *Jim Carlson Constr., Inc. v. Bailey,* 769 S.W.2d 480, 482 (Mo.App.W.D.1989). The fact that parties disagree over the interpretation of a contract or a provision does not mean the contract is ambiguous. *Crim v. National Life and Acc. Ins. Co.,* 605 S.W.2d 73, 76 (Mo. banc 1980) (other citations omit-

ted); *Harris v. Union Elec. Co.*, 622 S.W.2d 239, 247 (Mo.App.E.D.1981), *appeal after remand, Harris v. Union Elec. Co.*, 685 S.W.2d 607 (Mo.App.E.D.1985). "An ambiguity exists when there is more than one *reasonable* interpretation which can be gleaned from the contract language." *Harris*, 622 S.W.2d at 247 (citations omitted) (emphasis added). "Courts do not favor the destruction of agreements...." *City of Malden v. Green*, 779 S.W.2d 354, 356 (Mo.App.S.D.1989) (citing *Computer Network v. Purcell Tire & Rubber Co.*, 747 S.W.2d 669, 674 (Mo.App. E.D.1988)). We must, therefore, construe each term of a contract to avoid an effect which renders other terms meaningless or illusory. *Village of Cairo*, 685 S.W.2d at 264. Accordingly, when a contract provision is susceptible to two interpretations, only one of which is reasonable, the reasonable interpretation should be given effect. *Jim Carlson Constr., Inc.*, 769 S.W.2d at 482 (citing *Tri–Lakes Newspapers, Inc. v. Logan*, 713 S.W.2d 891, 894 (Mo.App.S.D.1986); *Village of Cairo*, 685 S.W.2d at 264 (citing *Harris*, 622 S.W.2d at 247)).

A review of this contract reveals that although it is susceptible of two interpretations, it is not ambiguous because only one of those interpretations is reasonable and plausible. It is this interpretation which must be given effect.

Paragraph 15 reads in relevant part:

In consideration of the right granted to Distributor pursuant to this Agreement, the validity and sufficiency of which is hereby acknowledged, *Distributor, on behalf of itself and its heirs, successors, executors, administrators and assigns (hereinafter "Heirs") hereby waive any and all rights which it may now or hereafter have under any statute, law, ordinance, common law principle or otherwise, to effect, by any means, the continuation of this Agreement or any rights granted pursuant hereto, or the payment of any compensation to Distributor or his Heirs as a result of any termination, expiration, forced assignment or cancellation (hereinafter col-*

*lectively referred to as "termination") of this Agreement, except as expressly provided for in this Agreement.* Without limiting the foregoing, Distributor hereby waives any alleged property rights which Distributor may now or hereafter have in any Distributor route, territory, customers or customers lists and any right to any compensation based upon any principle of waiver or estoppel or any other principle. The rights of the parties hereto including their Heirs with regard to any continuation of this Agreement or any compensation in connection with any termination or forced assignment or purchase hereof, are and shall be limited only to those express contractual rights as set forth in this Agreement. [emphasis added].[2]

Pulitzer and appellants struggle over the semantics in the contract. Distributors allege the word "continuation" as used in the waiver clause only refers to the situation in which Pulitzer attempts to terminate a distributor or force him/her to assign his/her route and the distributor attempts to "continue" to work for Pulitzer, perhaps by bringing a wrongful discharge suit or an action for reinstatement. In contrast, Pulitzer contends the use of the word "continuation" in the waiver clause estops distributors from taking any type of action to force Pulitzer to continue with any of the terms of the contract, in sum, to bring an action against Pulitzer for breach of contract relating to anything short of failure to compensate distributors for termination of their services. Pulitzer claims, in the event that Pulitzer breached the contract by paying the distributors less than it promised to pay them per newspaper, or by breaching the exclusivity provision, the distributors may be able to argue there was a de facto or pro rata termination or forced assignment and opt for arbitration under the contracts. Pulitzer, however, does not believe either situation, with respect to MetroPost or PostLink, warrants such an outcome.

Basing its holding on the use of the word "or" in the contract, ("or the payment of any

---

**2.** Pulitzer claimed at oral arguments that the waiver clause was placed in the contract to avoid situations in which distributors claim that the

Post Dispatch's editorial slant is affecting readership and, accordingly, the distributor's profits. This is not such a situation.

compensation . . .") the trial court found distributors had unambiguously waived their rights to bring an action against Pulitzer for breach of contract. However, our review of the contract reveals the clause "to effect, by any means, the continuation of this Agreement or any rights granted pursuant hereto" refers to the clause "as a result of any termination. . . ." As our court stated in *Dean Operations, Inc. v. Pink Hill Assoc.*, 678 S.W.2d 897 (Mo.App.W.D.1984), "It is widely acknowledged that courts frequently interpret the word "or" so as to carry out the plain purpose of the contract when the strict grammatical meaning of the word would defeat the purpose or lead to an absurd result." *Id.* at 899–900. (citations omitted). "This practice is proper when it 'is necessary to effectuate the intent of the parties as gathered [sic] from the four corners of the instrument.'" *Id.* (citing *Herrick Motor Co. v. Fischer Oldsmobile Co.*, 421 S.W.2d 58, 66 (Mo.App.Spr.D.1967)).

The reading Pulitzer attributes to the waiver clause in the contract would render most of the terms in the contract unenforceable. Distributors would be without any remedy if Pulitzer breaches the exclusivity factor (such as is alleged here), starts delivering an insufficient number of papers, or refuses to pay distributors the full amount of the money due per paper delivered. Distributors would be paying for a route which may or may not be exclusive, dependent upon Pulitzer's whim and Pulitzer would be agreeing to pay distributors however much it feels like paying them for delivery of the newspapers. The contract escapes the ranks of being an illusory contract merely because in the event Pulitzer fires a distributor, he/she is entitled to the fair market value of the route. Such an interpretation of the contract is not plausible in light of the more reasonable alternative.

Citing *Laclede Inv. Corp. v. Kaiser*, 541 S.W.2d 330 (Mo.App.E.D.1976), *appealed after remand, Laclede Inv. Corp. v. Kaiser*, 596 S.W.2d 36 (Mo.App.E.D.1980), and *Gierke v. Hayes*, 724 S.W.2d 282, 286–87 (Mo.App. W.D.1987), Pulitzer argues that waiver clauses of this kind are enforceable. The cases they cite, however, are distinguishable in that in those cases the parties to the contract were left with some form of a remedy in the case of a breach, *See Laclede Inv. Corp.*, 596 S.W.2d at 39; *Gierke*, 724 S.W.2d at 285, however, under Pulitzer's interpretation of the contract at issue appellants would be left empty handed absent termination.

We find the use of the word "continuation" in the waiver clause refers to a distributor's attempt to be reinstated following his/her termination. Distributors, therefore, only waived their rights to be reinstated after termination and the contract provision does not constitute a waiver of all rights to remedies in the event of a breach of contract. Such an interpretation is consistent with the other provisions of the contract which demonstrate Pulitzer's desire to retain control over hiring decisions. For example, Paragraph 15 emphasizes that distributors have no property rights in the routes. Paragraph 9 provides that "[t]he arbitrator shall not have the right or authority to reinstate the Distributor under any circumstances[,]" even if Pulitzer wrongfully terminates a distributor. Also, under Paragraph 8, in the event Pulitzer wrongfully refuses to approve a distributor's chosen successor, distributor's exclusive remedy is to require Pulitzer to purchase the route. We, therefore, find the trial court erred in finding the waiver clause precluded appellants from bringing suit against Pulitzer.

Pulitzer also claims this court could decide as a matter of law that reallocating delivery of the MetroPost does not violate the agreement since MetroPost is a free publication and is not the "St. Louis Post–Dispatch" newspaper. The portion of the contract to which Pulitzer is referring reads as follows:

The Publisher desires to retain the services of the Carrier as an independent contractor to deliver the daily St. Louis Post–Dispatch and the Sunday St. Louis Post Dispatch to the Publisher's home delivery subscriber: (as used herein home delivery subscribers shall include: (a) commercial concerns currently delivered by Carrier which do not resell the newspapers; (b) persons who are expecting regularly scheduled deliveries of newspapers at residential addresses *for whom credit is ex-*

**252**

*tended;* (c) all new commercial concerns requiring single issue delivery which do not resell the newspaper so long as Carrier can reasonably satisfy the commercial concerns' delivery requirements) and the Carrier desires to render such delivery services to the Publisher, in accordance with the provisions of this Agreement.

MetroPost is free to customers and accordingly does not fall within the "home delivery subscriber" definition contained in the preamble of the contract. However, Metro-Post, which is delivered on Wednesday, is merely a reprint of a section of the St. Louis Post–Dispatch newspaper delivered to subscribers the preceding Monday, with the title "St. Louis Post–Dispatch" having been substituted for "MetroPost". Furthermore, the preamble merely expresses Pulitzer's motivation for entering into the contract. It ends "Now, *therefore,* in consideration of the mutual covenants and promises contained herein, the *parties hereto agree as follows: ...*" The actual contract therefore follows the preamble. It provides that Pulitzer will honor the exclusive nature of the agreement and Pulitzer will pay distributors for delivering the MetroPost (which was then called "YOU") to nonsubscribers of the Post Dispatch. Moreover, Section 7 of the contract which establishes plaintiffs' exclusive territorial rights, contains no reference to the preamble or to the "home delivery subscriber" definition and does not express an intention to limit the exclusivity provision to receivers of the entire Post–Dispatch newspaper when the contract provides for payment for both delivery of the Post–Dispatch newspaper to subscribers and payment for delivery of MetroPost to nonsubscribers.

We find under the contract's unambiguous terms Pulitzer's reallocation of distributorship duties of the MetroPost to other carriers and refusal to pay distributors the fair market value of the lost profits constitutes a partial termination. Accordingly, we remand this issue to arbitration to determine the amount of damages due distributors in the event distributors and Pulitzer cannot agree on the fair market value. Pulitzer's reallocation of delivery of the MetroPost to other distributors constitutes a partial termination

under the contract's terms in light of section 5(vi) which provides Pulitzer must pay distributor for delivery of its Total Market Product (now entitled "MetroPost") to nonsubscribers and section 7 which provides Pulitzer shall "recognize the exclusive home delivery rights of the Carrier as set forth in [the map delineating the distributor's route] ... and [shall] not aid, abet or assist *in the creation of other home delivery systems or carriers*" [emphasis added]. Accordingly, distributors have a right to elect to go to arbitration to determine the fair market value of the breach of the exclusivity provision caused by Pulitzer's delivery of the Metro-Post.

Pulitzer asks that we find as a matter of law that the initiation of PostLink does not violate the contract since PostLink is not a newspaper. We find a question of fact remains concerning whether Pulitzer's delivery of news which is replicated in the Post–Dispatch via the PostLink computer database constitutes a breach of Pulitzer's agreement "not [to] aid, abet or assist in the creation of other *home delivery systems....*" Delivery of some of the same news which is included in the Post Dispatch to the homes or businesses which are included within the exclusive distributorship confines, may constitute a breach whether the news is being delivered via newspaper or modem provided the customer does not have to leave his/her home to access the news and the news is presented in the same format.

Accordingly, we remand this issue to the trial court for determination of whether the initiation of PostLink constitutes a breach. In the event the trial court finds Pulitzer breached the contract as to PostLink, said trier of fact shall assess damages. Costs to be assessed against Pulitzer.

SIMON, P.J., and KAROHL, J., concur.