# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3571

_____

| | | |
|---|---|---|
| Janet Clifton, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| American Family Mutual Insurance | * | |
| Company; American Family Life | * | |
| Insurance Company; American | * | |
| Standard Insurance Company of | * | |
| Wisconsin, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: May 18, 2007
Filed: November 13, 2007

_____

Before MURPHY, HANSEN, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Janet Clifton sued American Family Mutual Insurance Company and several of its affiliates (collectively, "American Family") for breach of contract. The district court[1] granted summary judgment in favor of the defendants, and we affirm.

_____

[1]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

In early 1993, Clifton entered into an agent agreement with American Family. This contract permitted Clifton, as an independent contractor, to operate an insurance agency in Raymore, Missouri. The agreement required Clifton to deliver policies and collect revenue for American Family, and allowed American Family to audit the agency's books from time to time. Clifton also agreed to maintain records and "refrain from any practices competitive with or prejudicial to [American Family]." The contract provided that all records of policies and transactions would be American Family's property.

It is undisputed that for the first two years that the agreement was in force, either party could terminate the relationship at will. After this two-year period, section 6(h)(2) of the contract required American Family to give "notice in writing of any undesirable performance which could cause termination of this agreement if not corrected." American Family agreed that once it had given this notice, it would not "terminate this agreement for those reasons for a period of six months after that written notice." The company reserved the right to terminate the agreement without notice for actions "prejudicial to the company," or "any other dishonest, disloyal or unlawful conduct."

Beginning in 2001, American Family began receiving an unusually high number of customer complaints about Clifton's agency. On October 8, 2002, Doug Willis, the district sales manager for Clifton's area, and Gladys Keith, the state sales director, met with Clifton to discuss the problem of poor customer service at Clifton's agency. At this meeting, Willis issued Clifton and her agency a notice of undesirable performance, in order to satisfy the agent agreement's requirement of giving notice before terminating the agreement. The notice cited numerous complaints from Clifton's clients. It directed Clifton that she must promptly respond to the needs of her policyholders, and specified that she must return telephone calls or other requests

for assistance in a professional and timely manner. The notice placed Clifton's agency "on a six-month program, starting October 15, 2002 through April 15, 2003," and warned Clifton that "[y]our agency['s] future lies in your hands."

After this notice, between January 1, 2003, and March 2, 2005, American Family received fifty-one more complaints regarding Clifton's agency. On January 20, 2005, Clifton had her annual "agency conference" with Zachery Edwards, who had replaced Willis as the district sales manager supervising Clifton's agency. At this conference, Edwards told Clifton that the agency was not meeting its goal of retaining customers, and that too many of Clifton's customers were complaining about the quality of her agency's service. Edwards warned Clifton that one more complaint would cause Edwards to issue a notice of undesirable performance. That complaint arrived during the meeting, so Edwards discussed with his assistant the possibility of issuing a notice. At this point, Edwards's assistant informed him that Clifton already had received a notice of undesirable performance more than two years earlier. Edwards did not send another letter.

On March 1, 2005, American Family received a complaint from a customer that cash payments made to Clifton's agency were not being credited to his account. The following day, another customer complained that her insurance was out of force because of a billing problem, but that she could not reach anyone at Clifton's agency. At this point, Edwards's assistant tried to set up a meeting between Clifton and the customer. Lori O'Malley, Clifton's daughter and an assistant at the agency, stated that she and Clifton would arrive at the office by 2:30 p.m. Feeling that he should investigate the complaint immediately, Edwards decided that he and his assistant would visit Clifton's agency to review her payment records. When the two arrived, the only employee at the agency was Harold Clifton, Janet's husband. A disgruntled customer was waiting to see Janet Clifton, who was not present.

Edwards asked to review the agency's receipt books. At some point, Harold spoke on the telephone with O'Malley, and told her that Edwards and his assistant had come to the office to investigate the complaints. O'Malley then called a police officer she knew and asked for his help with a "situation" at the office. The officer arrived, along with three other officers, at about the same time that Clifton and O'Malley arrived. At this point, O'Malley told Edwards that he would need to schedule an appointment to review the receipt book. O'Malley maintained that she would need "hours and hours to find" the relevant records, so Edwards would have to return after O'Malley had sufficient time to uncover them. After being asked to leave, Edwards and his assistant departed the office.

In the aftermath of this incident, Edwards suggested terminating the agent agreement, and his supervisors agreed. On March 7, 2005, Edwards delivered to Clifton a letter terminating the agent agreement. The letter cited three bases for this decision. First, the letter described the March 2 incident and stated that Clifton's "failure to allow [Edwards] to review the needed records is prejudicial to the interests of American Family." Second, the letter stated that Clifton's agency had "mishandled customer premium funds," and had failed to submit "premium monies" to American Family in a timely manner. Third, the letter recounted that American Family had "logged numerous service complaints" from Clifton's clients in recent months, including Clifton's failure to return telephone calls in a timely manner, and her failure to process requested policy changes in a timely manner. The termination letter said that Clifton's "failure to provide timely and quality customer service" was prejudicial to the company.

Clifton requested an administrative review of her termination by Jeff Burke, American Family's vice president for marketing. Burke observed that Clifton had received a six-month notice of undesirable performance, as required by the agent agreement, in October 2002, but that American Family "continued to receive customer service complaints and encountered the premium submittal discrepancy." He also

explained that since Clifton's termination, American Family had received "additional complaints regarding customers' inability to reach her and her failure to follow-up on customer concerns during her tenure as an American Family agent." Burke recommended that the termination "stand as requested by field management."

## II.

Clifton commenced this suit for breach of contract, alleging that the American Family had terminated the agent agreement without the notice and six-month probationary period required by the agreement. The district court granted summary judgment for American Family, holding that the termination provisions of the agreement did not require cause for termination. Alternatively, the court concluded that the agreement was terminable at will after the passage of the six-month probationary period. The district court also noted that Clifton's refusal to cooperate with American Family's investigation "could reasonably be characterized as disloyal" or "prejudicial" under the terms of the agent agreement. On appeal, Clifton maintains that the agent agreement required another six-month probationary period before American Family could terminate the agreement, and that she did not engage in disloyal or prejudicial conduct. We review the district court's grant of summary judgment *de novo*, taking the facts in the light most favorable to Clifton.

Under Missouri law, which applies here, courts look only to the contract language when interpreting the agreement, unless the language is ambiguous. *Royal Banks of Missouri v. Fridkin*, 819 S.W.2d 359, 361 (Mo. 1991). In this case, we see no ambiguity concerning whether American Family was permitted to terminate the agency in March 2005 based on Clifton's undesirable performance. Accepting for purposes of analysis that the notice requirement of section 6(h)(2) of the agent agreement applies to *all* undesirable performance by an agent with a tenure of more than two years, *cf. Adams v. Am. Family Mut. Ins. Co.*, No. 98-15711, 1999 WL

386913, at *3 (9th Cir. 1999) (unpublished), we agree with the district court that American Family provided the requisite notice.

The agreement requires American Family to give notice of "any undesirable performance which could cause termination of this agreement if not corrected." The agreement provides that once notice was given, American Family could not "terminate this agreement for those reasons for a period of six months after that written notice." American Family issued Clifton a notice of undesirable performance in October 2002, and this notice placed Clifton "on a six-month program" ending in April 2003. Clifton observes that American Family did not terminate the agreement at the conclusion of this period, and she contends that it could not terminate the agreement two years later without issuing another notice. In her view, "any termination resulting from a six-month notice must be effectuated within a reasonable time after the end of the [six-month] program," and there is at least a genuine issue of fact as to whether the timing here was "reasonable."

We see no basis in the agreement to impose this requirement of additional notice. The contract states only that American Family agreed not to terminate the agreement based on the undesirable performance of which it gave notice – i.e., numerous service complaints and failure to provide timely and professional service – "for a period of six months after that written notice." Once notice was given, and American Family complied with the requirement to withhold action for six months, the agreement does not forbid American Family to terminate the agreement for the reasons described in the notice at any time after the conclusion of the six-month period. At most, the agreement gave agents with tenure of two years the additional protection of one-time notice that American Family considered particular performance undesirable, followed by a six-month safe harbor after receipt of that notice. But the agreement did not guarantee Clifton that if the undesirable performance persisted or recurred, then she would be given another window of six months to correct the problem before American Family ended the relationship. Having been notified once

-6-

that American Family considered numerous service complaints regarding failure to provide timely service to be undesirable and unacceptable performance, Clifton was entitled to no additional notice before American Family terminated the agreement on that basis.

We also see no genuine issue of fact concerning the existence of "undesirable performance" for which American Family could terminate Clifton's agreement. The initial notice of undesirable performance cited "numerous service complaints" from Clifton's customers and directed Clifton to respond promptly to the "service needs" of her clients. When the company decided to end its association with Clifton, Edwards relied on "numerous service complaints" and Clifton's "failure to provide timely and quality customer service." In upholding the decision, Burke again cited "customer service complaints" and Clifton's "failure to follow-up on customer concerns." Whether or not each and every customer complaint was well founded, there is no genuine dispute that the problem with a high volume of service complaints persisted at Clifton's agency, and American Family understandably considered that circumstance to be undesirable and unacceptable, in and of itself. While the Edwards letter also said that Clifton's performance was "prejudicial" to the company, Burke's subsequent letter specifically cited Clifton's "undesirable performance" and the previous notice to her in October 2002. We need not decide, therefore, whether the contractual provision concerning practices "prejudicial to the Company" supplies a separate basis that would justify terminating Clifton's agreement without any notice whatever.

\* \* \*

For these reasons, the judgment of the district court is affirmed.

_____